# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Corbin R. Davis

## PEOPLE v SMITH

Docket No. 148305.  Argued January 13, 2015 (Calendar No. 3).  Decided July 30, 2015.

Feronda Montre Smith was convicted in the Genesee Circuit Court, Joseph J. Farah, J., of armed robbery, MCL 750.529, and first-degree felony murder, MCL 750.316(1)(b), following a jury trial.  The charges were related to the death of Larry Pass, Jr., a drug dealer.  At trial, two prosecution witnesses claimed to have been present when defendant allegedly shot Pass.  Tarence Lard testified for the prosecution as part of a plea agreement for his part in the crime.  Mark Yancy maintained his innocence with respect to the shooting but admitted collecting Pass's drugs, helping dispose of the murder weapon, and using cocaine with defendant and Lard after the shooting.  At a pretrial hearing, a Federal Bureau of Investigation special agent who led a task force had testified that Yancy was compensated for his assistance in an FBI inquiry into Pass's murder and a suspected criminal enterprise involving defendant.  At trial, however, the fact and extent of Yancy's participation in the investigation that led to the prosecution of defendant and the compensation Yancy received for it were not made known to the jury.  Instead, Yancy testified that he had not been paid for his cooperation in relation to defendant's case.  Defendant appealed his convictions, arguing in part that he had been denied his Sixth Amendment right to a speedy trial by a delay of 41 months and that the prosecutor's failure to correct Yancy's false testimony violated his right to due process and denied him a fair trial.  The Court of Appeals, GLEICHER, P.J., and RONAYNE KRAUSE and RIORDAN, JJ., affirmed in unpublished opinion per curiam, issued October 29, 2013 (Docket No. 304935), because the panel was not persuaded that the prosecutor's failure to correct Yancy's false testimony had made a difference in the jury's estimation of his credibility.  The panel also concluded that defendant had not shown prejudice sufficient to constitute a violation of his right to a speedy trial.  Defendant applied for leave to appeal, which the Supreme Court granted.  496 Mich 855 (2014).

In an opinion by Justice MCCORMACK, joined in full by Chief Justice YOUNG and Justices MARKMAN and VIVIANO and by Justice BERNSTEIN (except for footnote 5), the Supreme Court *held*:

The prosecution breached its duty to correct the substantially misleading, if not false, testimony of a key witness about his formal and compensated cooperation in the government's investigation.  Given the overall weakness of the evidence against defendant and the significance

of the witness's testimony, there was a reasonable probability that the prosecution's exploitation of the substantially misleading testimony affected the jury's verdict.

1. The prosecution may not knowingly use false evidence, including false testimony, to obtain a conviction. The prosecution has an affirmative duty to correct false testimony, and the duty specifically applies when the testimony concerns remuneration for a witness's cooperation. The duty applies even if the false testimony goes only to the credibility of the witness. Moreover, the prosecutor's blameworthiness is relevant. While the prosecutor need not correct every instance of mistaken or inaccurate testimony, the effect of a prosecutor's failure to correct false testimony is the crucial inquiry for due-process purposes. A new trial is required if the uncorrected false testimony could in any reasonable likelihood have affected the jury's judgment.

2. Yancy's trial testimony undoubtedly left the jury with the impression that he received no payment of any kind for his participation in this case. That overall impression was false. Instead of rectifying this false impression, the prosecutor capitalized on and exploited it. When Yancy specifically denied during cross-examination that he had been compensated in connection with the investigation of defendant, the prosecutor again did nothing to correct the testimony but instead used it to her advantage in closing argument, urging the jury to credit Yancy's story because he had not received consideration on this case for testifying even though he had received consideration on other task force cases. The prosecutor's repeated emphasis on Yancy's lack of compensation for testifying and her comments at closing argument enhanced the misleading impression that Yancy was a totally independent witness, underscoring the jury's false impression that because Yancy had not been paid to testify, he had no questionable incentive for his participation in this case.

3. Due process required that the jury be accurately apprised of the incentives underlying the testimony of this critical witness and that the prosecution not exploit any confusion relating to this critical topic. No physical evidence connected defendant to the crime, and he was convicted solely on the testimony of two witnesses who had significant credibility issues. The jury knew that Lard testified pursuant to a favorable plea agreement for his role in the crime, and his testimony was inconsistent with Yancy's version of events. Yancy's account of the crime also had inconsistencies and did not cast him in a favorable light. There was, therefore, a basis for skepticism about both Lard and Yancy. As far as the jury knew, however, Yancy was uniquely credible in one respect: he was the sole lay witness who did not directly benefit from his participation in the case. Had the jury been aware of Yancy's compensation, the prosecution might well have had a more difficult task persuading the jury to believe Yancy. Given the effect that Yancy's uncorrected testimony had on his credibility, the central role that credibility played in securing defendant's convictions, and the dearth of other evidence implicating defendant, there was a reasonable likelihood that the false impression resulting from the prosecutor's exploitation of the testimony affected the jury's judgment. Accordingly, defendant was entitled to a new trial.

4. While the delay before defendant's trial was extraordinary, defendant did not show sufficient prejudice to merit dismissal for a violation of his right to a speedy trial.

Court of Appeals' judgment reversed in part, defendant's convictions vacated, and case remanded for a new trial.

Justice BERNSTEIN, concurring in part and dissenting in part, concurred with the majority except for footnote 5 of its opinion, which concluded that defendant had not shown sufficient prejudice to merit dismissal for a violation of his right to a speedy trial. With respect to defendant's speedy-trial claim, Justice BERNSTEIN instead concurred with Part II of Justice KELLY'S opinion. Accordingly, he would have in addition reversed the judgment of the Court of Appeals with respect to the speedy-trial claim and remanded this case to the trial court for it to consider whether the prosecution overcame the presumption of prejudice to defendant's person and defense.

Justice KELLY, joined by Justice BERNSTEIN with respect to Part II of the opinion only (concerning the speedy-trial issue), concurred in the result of the majority's opinion with respect to Yancy's false testimony. She dissented to the extent that the majority expanded the traditional standard concerning the prosecution's use of false evidence to instead allow a new trial merely on the basis of "substantially misleading" testimony, agreeing with Justice ZAHRA on this point. Applying the traditional standard to this case, however, Justice KELLY agreed that Yancy's testimony was false, that it was reasonably likely that his uncorrected false testimony affected the jury's judgment, and that defendant was therefore entitled to a new trial. Justice KELLY dissented from the majority's resolution of the speedy-trial issue. The trial court did not correctly apply the balancing test from *Barker v Wingo*, 407 US 514 (1972), to assess defendant's speedy-trial claim after his trial had been delayed for 41 months while he was in prison. Some of the factors to be considered under the *Barker* test are (1) the length of the delay, (2) the justification for the delay, (3) the defendant's assertion of his or her right, and (4) the multifaceted prejudice to the defendant. The trial court did not apply the rule that prejudice is presumed after a delay of 18 months and that the burden then shifts to the prosecution to show there was no injury to the defendant's person or defense. Despite a total delay exceeding 18 months when defendant first moved for a speedy trial, the court found that defendant had not established prejudice because the total delay by the prosecution was less than 18 months. The Court of Appeals recognized that the trial court had misunderstood the *Barker* prejudice prong, but incorrectly concluded that no error had occurred. No prosecutorial evidence overcoming the presumption of prejudice appears on the record. By failing to fully engage in the balancing process established by *Barker* and therefore failing to impose the proper burden on the prosecution, the trial court did not afford defendant the complete protection of his right to a speedy trial. Justice KELLY would have reversed the judgment of the Court of Appeals, vacated defendant's convictions, and remanded this case to a new judge in the Genesee Circuit Court to consider whether the prosecution overcame the presumption of prejudice. If that presumption was overcome, a new trial would be warranted on the basis of the majority's reasoning. However, if the presumption was not overcome, a dismissal of all charges would be the only remedy for the speedy-trial violation.

Justice ZAHRA, dissenting, agreed that the prosecution may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, but stated that the majority had turned this constitutional principle into a new requirement that the prosecutor must elicit not just truthful testimony, but also complete testimony, fully disclosing all the facts and

circumstances of how that witness came to testify. He further concluded that the majority had imposed an additional duty on the prosecutor to correct a defense attorney's mischaracterized questions made during the cross-examination of a prosecution witness. The result was an unacceptably high and extraordinarily ambiguous standard requiring prosecutors to correct every instance of mistaken, inaccurate, or incomplete testimony or risk every possible or perceived contradiction being rendered material. Yancy's relationship with the government and the details of his compensation were fully disclosed before trial. What the majority concluded was false or substantially misleading would be better characterized as incomplete testimony. Accordingly, the prosecutor did not commit an error by failing to clarify that evidence in the manner required by the majority. Nor was the prosecutor's closing argument an improper exploitation of misleading testimony. Moreover, to the extent that the prosecutor's actions constituted error, that error was extinguished by defendant's waiver, forfeited for lack of preservation, or harmless. Justice ZAHRA would have affirmed defendant's convictions.

©2015 State of Michigan

# OPINION

Chief Justice:    Justices:

Robert P. Young, Jr.    Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

FILED  July 30, 2015

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v    No. 148305

FERONDA MONTRE SMITH,

    Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MCCORMACK, J.

In this case, we consider whether the prosecution breached a duty to correct the substantially misleading, if not false, testimony of a key witness about his formal and compensated cooperation in the government's investigation.  Given the overall weakness of the evidence against the defendant and the significance of the witness's testimony, we conclude that there is a reasonable probability that the prosecution's exploitation of the substantially misleading testimony affected the verdict.  See *Napue v Illinois*, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959).  We therefore reverse the judgment

of the Court of Appeals in part, vacate the defendant's convictions, and remand this case to the Genesee Circuit Court for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

The defendant was charged with, among other things, armed robbery, MCL 750.529, and first-degree felony murder, MCL 750.316(1)(b), after the police found known drug dealer Larry Pass, Jr., dead in Pass's own home. At the defendant's trial, two prosecution witnesses claimed to have been present when the defendant allegedly shot Pass. The first witness was codefendant Tarence Lard, who testified for the prosecution as part of a plea agreement for his part in the crime. The second witness was Mark Yancy, who maintained his innocence with respect to the shooting but admitted collecting Pass's drugs, helping dispose of the murder weapon, and using cocaine with the defendant and Lard after the shooting. Yancy and Lard contradicted one another in important ways, although both testified that Yancy and the defendant had had a violent dispute over money in the weeks leading up to the murder. No other evidence connected the defendant to the crime or confirmed that he had ever been at the scene, and no murder weapon was ever recovered.

Yancy was a paid informant;[1] he had been compensated for his assistance in a Federal Bureau of Investigation (FBI) inquiry into Pass's murder and a suspected

---

[1] More than three years before the trial in this case, around October 2008, the Federal Bureau of Investigation paid Yancy $4,000 for information he provided to a joint local and federal task force relating to the task force's investigation of the "Pierson Hood gang" and its wide-ranging criminal activity in the Flint area, including facts relevant to the murder at issue in this case. Accordingly, this Genesee County prosecution was the result of the work of that task force, including Yancy's compensated cooperation with it.

2

criminal enterprise involving the defendant. This fact was made clear in a pretrial hearing, during which the prosecutor[2] specifically called the investigation's FBI task force leader and informant coordinator, Special Agent Dan Harris, to address informant compensation in the case. Harris testified that Yancy was paid for his cooperation relating to "the Larry Pass homicide[,] which was information against Mr. Lard and Mr. Smith [the defendant]."[3]

At trial, however, the fact and extent of Yancy's participation in the investigation that lead to the prosecution of the defendant and the compensation Yancy received for it was never made known to the jury. On the contrary, Yancy testified that he was not paid for his cooperation in relation to "this case," i.e., the prosecution of the defendant for Pass's murder. The topic first arose during direct examination, during which Yancy admitted in response to the prosecutor's question that he had been "paid by a federal

---

[2] The assistant prosecutor who appeared at this pretrial hearing was also the trial prosecutor.

[3] Harris's full explanation was as follows:

> I did determine the amount on Mark Yancy was $4,000. The request was originally requested or submitted in October of 2008. I could not recall or could not find the date it was actually paid. The reason for [Yancy's] payment was for information against Pierson Hood members and their involvement, also for the Larry Pass homicide which was against Mr. Lard and Mr. Smith.

Harris made no further statements about the purposes of Yancy's compensation, nor did he describe how the payment was apportioned respective to information about Pierson Hood or the Pass homicide. We therefore disagree with the dissent's characterization of Harris's testimony as stating that the payment was "due in *significant* part for [Yancy's] cooperation relating to [Pierson Hood]." *Post* at 5 n 6 (emphasis added).

3

agency for [his] cooperation." Neither the prosecutor's question nor Yancy's answer tied his cooperation to his involvement in the investigation of the defendant as the prime suspect in Pass's murder. In order to avoid linking Yancy's compensated cooperation to the investigation and prosecution of the defendant, the prosecutor carefully limited her subsequent questions to whether he was specifically paid for the testimony he was giving, which Yancy denied.[4] By itself, such cautious presentation of testimony might not have been problematic because the prosecution was careful not to elicit outright false testimony. But then Yancy took this denial further during cross-examination:

> [*Defense Counsel*]: Do you deny -- first of all, it sounds like you agreed that you were paid $4,500 for *cooperating* with law enforcement, correct?

---

[4] The full exchange was as follows:

> [*Prosecutor*]: Now, you've been paid by a federal agency for cooperation. Is that correct?

> [*Yancy*]: Yes.

> [*Prosecutor*]: And the money that you were paid was not related to testifying in this case, was it?

> [*Defense Counsel*]: Objection. Leading.

> [*Yancy*]: No.

> *The Court*: Okay. You can rephrase the question.

> [*Prosecutor*]: I'll rephrase.

>            * * *

> Were you paid for your testimony in this case?

> [*Yancy*]: No.

[*Yancy*]: Correct.

[*Defense Counsel*]: But you deny that it was with regards to this case, correct?

[*Yancy*]: Correct.  [Emphasis added.]

The prosecutor revisited the topic during redirect examination, again limiting her question to whether Yancy had been paid for his "testimony" in particular.  Yancy again denied being compensated:

[*Prosecutor*]: Okay, and just so we're clear, you were not paid to testify in this case, correct?

[*Yancy*]*: Correct.

Four times, then, Yancy denied having been paid in connection with the defendant's case—specifically, that he had not been compensated for his testimony at the defendant's trial and also that he had not been otherwise compensated for "cooperating" "with regards to this case."  Clearly, the jury could have interpreted this statement to indicate that Yancy had *never* been paid for his involvement with the investigation of the Pass homicide, not merely that the Genesee County Prosecuting Attorney's office had not compensated him for "testimony" or cooperation with the defendant's formal prosecution.  The latter point might have been true; the former point was plainly misleading and likely untrue, as the prosecutor well knew, having elicited Harris's testimony at the pretrial hearing.  This former point, however, was never corrected or clarified at trial, nor was the true nature or extent of Yancy's participation or compensation as an informant put before the jury.  Rather, the prosecutor exploited the potential confusion Yancy's testimony created by reminding the jury of Yancy's denials during closing argument, cementing the false notion that Yancy had only been paid for

5

his cooperation in *other cases*, and attempting to advance his credibility as a result of that fact:

> Mark Yancy was here, ladies and gentlemen, and he talked to you about [sic] he wasn't charged in this homicide, and that he admitted he was in the house at the time of the homicide, and that he got the cocaine, and gave it to Lard and the defendant. *He told you he did not get consideration on this case for testifying, that he got consideration on other cases that the task force was involved with*. [Emphasis added.]

The jury found the defendant guilty of armed robbery and felony murder, but acquitted him of the other charges. On June 30, 2011, the defendant was sentenced as a fourth-offense habitual offender to life in prison for the murder conviction and to 20 years, 10 months to 35 years for the armed-robbery conviction. The defendant appealed and, among other issues, argued that the prosecution's failure to correct Yancy's false testimony violated his right to due process and denied him a fair trial. The Court of Appeals affirmed his convictions because it was unpersuaded that the failure to correct Yancy's false testimony made a difference in the jury's estimation of his credibility. *People v Smith*, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2013 (Docket No. 304935), p 5. The defendant then sought this Court's review, and we granted leave to appeal.[5]

---

[5] We granted to leave to appeal, limited to two issues: "(1) whether the defendant was deprived of his constitutional right to a speedy trial; and (2) whether the defendant was deprived of his due process right to a fair trial through the presentation of perjured testimony." *People v Smith*, 496 Mich 855 (2014).

While we agree that the delay in this case was extraordinary, we are not persuaded that the defendant has shown sufficient prejudice to merit dismissal for a violation of his right to a speedy trial. See *Barker v Wingo*, 407 US 514, 530, 532; 92 S Ct 2182;

6

## II. LEGAL BACKGROUND

A due process violation presents a constitutional question that this Court reviews de novo. *People v Wilder*, 485 Mich 35, 40; 780 NW2d 265 (2010). It is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected. *Napue*, 360 US at 269; see also *People v Wiese*, 425 Mich 448, 453-454; 389 NW2d 866 (1986); *Giglio v United States*, 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972). It is well established that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . ." *Napue*, 360 US at 269. Indeed, the prosecution has an affirmative duty to correct false testimony, and this duty specifically applies when the testimony concerns remuneration for a witness's cooperation. See *Giglio*, 405 US at 154-155; *Wiese*, 425 Mich at 455-456. The responsibility "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 US at 269. Nor is the blameworthiness of the prosecutor relevant. *Smith v Phillips*, 455 US 209, 220 n 10; 102 S Ct 940; 71 L Ed 2d 78 (1982). Rather, while "not every contradiction is material" and the prosecutor need not correct every instance of mistaken or inaccurate testimony, *United States v Martin*, 59 F3d 767, 770 (CA 8, 1995), it is the *effect* of a prosecutor's failure to correct false testimony that "is the crucial inquiry for due process purposes," *Smith*, 455 US at 220 n 10. A prosecutor's capitalizing on the false testimony, however, is of particular concern because it "reinforce[s] the deception of the use of false testimony and thereby

33 L Ed 2d 101 (1972). We therefore affirm on that issue for the reasons stated in the Court of Appeals' opinion.

7

contribute[s] to the deprivation of due process." *DeMarco v United States*, 928 F2d 1074, 1077 (CA 11, 1991); see *Jenkins v Artuz*, 294 F3d 284, 294-295 (CA 2, 2002) (stating that the prosecutor's promotion of the false testimony at summation "plainly sharpened the prejudice," " 'ha[d] no place in the administration of justice[,] and should neither be permitted nor rewarded") (citations and quotation marks omitted); *Mills v Scully*, 826 F2d 1192, 1195 (CA 2, 1987) ("[T]here may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in closing argument . . . ."). A new trial is required if the uncorrected false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 US at 271-272; see also *Giglio*, 405 US at 154. Furthermore, as one federal circuit court of appeals has stated:

> Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness's responses on cross-examination. However, when it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury. [*United States v Harris*, 498 F2d 1164, 1169 (CA 3, 1974).][6]

---

[6] See also *Jenkins*, 294 F3d at 296 ("[W]hile [the prosecutor's] questions elicited technically correct answers, . . . they left the jury with the mistaken impression that no plea agreement existed. We can think of no credible explanation for [the prosecutor's] conduct other than an attempt to reinforce [the witness's] false testimony."); *United States v Barham*, 595 F2d 231, 241 (CA 5, 1979) (asserting the prosecution's duty to correct testimony that "if not outright lies, certainly conveyed the false impression that none of [the] witnesses had received any promises of leniency or other considerations").

In *Harris*, a government witness falsely testified during cross-examination that in exchange for her testimony against the defendants, the prosecution had made no promises

III.  APPLICATION

A.  FAILURE TO CORRECT TESTIMONY

As the Court of Appeals correctly observed, Yancy's trial testimony undoubtedly left the impression that he received no payment of any kind for his participation in this case, either for his testimony or for his prior cooperation that was the necessary condition to his testimony.  The overall impression conveyed was false.  Whether Yancy understood why or for what he had been compensated, the prosecutor knew that Agent Harris had given uncontroverted pretrial testimony that Yancy was compensated for information central to the formal prosecution of the defendant.

Instead of rectifying this false impression regarding Yancy's involvement, the prosecutor capitalized on and exploited it.  Though well aware of Harris's testimony and the fact of Yancy's compensation, the prosecutor never took any steps to correct or explain Yancy's testimony.  Rather, the prosecutor carefully limited her questioning of Yancy to the fact that he had been paid for cooperating with law enforcement, while never seeking to clarify that Yancy had been compensated for his cooperation in the

to help her achieve a reduced sentence on pending state charges against her.  *Harris*, 498 F2d at 1166-1167.  The prosecutor brought the witness's false testimony to the attention of the court and defense counsel a day after the testimony was given but still during the government's case-in-chief and offered to stipulate it.  *Id.* at 1167.  Unlike the prosecutor in this case, the *Harris* prosecutor did not seek to capitalize on the false testimony, but rather offered to correct it.  *Id.*  Indeed, it was the defendant's affirmative failure to take advantage of that offer and use other means to reveal the untruth that was fatal to the ability to complain about it on appeal.  *Id.* at 1170.  The dissent overlooks this important difference, and conflates the distinct prosecutorial duties to disclose exculpatory information, see *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), and to refrain from using false or misleading testimony to obtain a conviction, see *Napue*, 360 US at 269.  See note 8 of this opinion.

investigation of the defendant. To the contrary, the prosecutor further distanced Yancy from the latter by emphasizing that any payment for his cooperation came from a "federal agency" and, impliedly, had nothing to do with the pending charges against the defendant. The prosecutor's follow-up questions built on this obfuscation; after leaving Yancy's testimony regarding his cooperation with law enforcement ambiguous and untethered to the defendant's case, the prosecutor pivoted directly to the more limited claim that Yancy specifically had not been paid to *testify* at trial. And when Yancy specifically denied during cross-examination that he had been compensated in connection with the investigation of the defendant, the prosecutor again did nothing to correct it.[7]

---

[7] The obligation to avoid presenting false or misleading testimony of its own witness begins and ends with the prosecution and is prudent in the unique *Napue* context because *Napue* requires the prosecution's knowledge of the false or misleading testimony of its own witnesses. *Napue*, 360 US at 269. While we do not disagree that a defendant can waive a claim of error under *Napue*, we do not share the dissent's view that there was waiver in this case. First, we disagree with the dissent that the record reveals any strategy by defense counsel to keep the impeaching information from the jury. Given that we see no strategy here, the dissent's reference to cases finding waiver when counsel strategically elected not to address a government witness's false testimony is beside the point. We note, however, that we do not read all the cases the dissent cites in support of this general proposition as relevant. Two did not involve false testimony about a witness's cooperation agreement, see *Beltran v Cockrell*, 294 F3d 730, 735 (CA 5, 2002) (observing that the defendant prevented the prosecution from clarifying the allegedly false testimony that the defendant was the only person identified as the assailant); *United States v Decker*, 543 F2d 1102, 1105 (CA 5, 1976) (noting that any error from the witness's false statements about his attorney's presence at his cooperation meeting were harmless), and in another, the court held that it was not clear that there was any cooperation agreement with the witness at all, see *United States v Meinster*, 619 F2d 1041, 1045 (CA 4, 1980) ("Nothing was promised in exchange for [the witness's] testimony in this case."). Importantly, however, when a prosecutor has capitalized on the false or misleading evidence, the waiver rule is more nuanced. See *Jenkins*, 294 F3d at 296 (concluding that there was no waiver because "the prosecutor's actions cannot be overlooked on the ground that [defense] counsel did not continue to seek to gain an

10

She instead used Yancy's general claims of noncompensation to her advantage in closing, urging the jury to credit his story because "[h]e told you he did not get consideration on this case for testifying, that he got consideration on *other cases* that the task force was involved with." (Emphasis added.)

Capitalizing on Yancy's testimony that he had no paid involvement in the defendant's case is inconsistent with a prosecutor's duty to correct false testimony.[8]

---

admission from [the witness] as to the plea agreement"); *Barham*, 595 F2d at 243 n 17 (concluding that there was no waiver because the prosecutor's "misleading questions . . . reinforced the deception"); *United States v Sanfilippo*, 564 F2d 176, 178-179 (CA 5, 1977) (concluding that there was no waiver when the prosecutor failed to correct and subsequently capitalized on the false testimony); *DeMarco*, 928 F2d at 1077 (concluding that there was no waiver when the prosecution's capitalizing on the testimony "contributed to the deprivation of due process"). Therefore, even if, as the dissent argues, counsel had a conscious strategy to keep the true nature of Yancy's compensation from the jury, it is far from clear whether that would have led to a waiver in this case, given that the prosecutor capitalized on the misleading evidence in her summation to the jury. In any event, what precise role counsel's effectiveness might play in determining the reviewability of a *Napue* complaint on appeal is not one we need reach today, since the prosecution has never argued in the course of this appeal that the defendant waived this *Napue* objection. See *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009).

[8] The dissent insists that the prosecution's duty to correct false testimony under *Napue*, 360 US at 269, must be coupled with the separate, though often overlapping, duty to disclose exculpatory information under *Brady*, 373 US at 87. The dissent consequently asserts that "[i]t is the secreting of evidence that is offensive to due process." *Post* at 5-6. We agree that the secreting of evidence violates due process, but so too does a prosecutor's exploitation of false testimony by a state witness to gain a conviction, whether done together with a failure to disclose or not. In many cases, dereliction of both duties happens in tandem when a witness falsely testifies about an undisclosed cooperation agreement. But they need not happen together, and when they do not, the prosecution's *Napue* duty is not mitigated because it complied with its *Brady* duty. See *Jenkins*, 294 F3d at 296; *Sanfilippo*, 564 F2d at 178-179; *DeMarco*, 928 F2d at 1076-1077; *Belmontes v Brown*, 414 F3d 1094, 1115 (CA 9, 2005) ("Whether defense counsel is aware of the falsity of the statement is beside the point. . . . The prosecutor's duty to

correct false testimony arises, not simply out of a duty of fairness to the defendant, but out of the free standing constitutional duty of the State and its representatives to protect the system against false testimony."), rev'd on other grounds sub nom *Ayers v Belmontes,* 549 US 7; 127 S Ct 469; 166 L Ed 2d 334 (2006) (citations and quotation marks omitted). The dissent's argument to the contrary is not supported by the authority it cites. *Routly v Singletary*, 33 F3d 1279 (CA 11, 1994), for example, does not address the idea that all *Napue* violations must accompany *Brady* violations. Rather, *Routly* involved unsuccessful and overlapping *Brady* and *Napue* claims, but each was denied because the prosecution had complied with each duty. *Id.* at 1284-1287.

Furthermore, the post-*Sanfilippo* cases in the United States Court of Appeals for the Fifth Circuit that the dissent cites certainly did not distinguish *Sanfilippo*'s relevance in cases in which, as here, the prosecutor capitalized on a freestanding *Napue* error. Compare *Sanfilippo*, 564 F2d at 178-179 (concluding that there was no waiver when the prosecutor failed to correct and subsequently capitalized on the false testimony), with *Beltran*, 294 F3d at 736-737 (concluding that *Sanfilippo* was inapposite because the prosecution had not "used the false testimony consciously allowed by the defense as part of a legal strategy"), and *United States v Antone*, 603 F2d 566, 570-571 (CA 5, 1979) (concluding that *Sanfilippo* was inapposite because it involved false testimony of "far more serious impact," i.e., relating to the conditions of the witness's plea deal for his testimony, while *Antone* simply involved an arrangement to have legal counsel appointed for the witness). And indeed, at least one post-*Sanfilippo* case from the Fifth Circuit has affirmed *Sanfilippo*'s rule that a prosecutor's capitalizing on false testimony might result in a due process deprivation even when the defense can be charged with knowledge of the evidence. See *Barham*, 595 F2d at 243 (stating that the prosecutor's "misleading questions . . . reinforced the deception" and "undermine[d] the Government's argument that defense counsel waived the false evidence issue" by virtue of his knowledge of the falsity).

There is no question that the prosecution complied with its *Brady* obligation regarding Yancy's compensation for his cooperation. Yet when Yancy's trial testimony did not reflect the true nature of his agreement, instead of clarifying, the prosecutor exploited the testimony to her advantage. This due process error stands apart from a failure to disclose. See *Jenkins*, 294 F3d at 296 (stating that "the prosecutor's actions cannot be overlooked" on the ground that defense counsel knew about and "did not continue to seek to gain an admission from [the witness] as to [his] plea agreement"); *Napue*, 360 US at 269 (stating that the duty to correct false evidence arises "when it appears"). The dissent's understanding that any *Napue* violation is only meaningful when coupled with a *Brady* violation simply misunderstands the separate duties.

12

Indeed, the prosecutor sought to transform testimony that might have been merely confusing on its own into an outright falsity. Irrespective of the veracity of Yancy's claim that he had not been paid to "testify," the prosecutor should not have capitalized on Yancy's testimony after Yancy had confusingly denied being paid for cooperating in "this case."[9] *Napue*, 360 US at 269. The prosecutor's repeated emphasis on Yancy's lack of compensation for "testifying" and her comments at closing argument enhanced the misleading impression that Yancy was a totally independent witness. Her actions served to underscore the jury's false impression that because Yancy because had not been paid to "testify," he had no questionable incentive for his participation in this case.[10] Simply put, the prosecutor sought to benefit from the problematic testimony and use it to her advantage. This prosecutorial conduct does not comport with due process.[11] See *DeMarco*, 928 F2d at 1077; *Jenkins*, 294 F3d at 294-295.

---

[9] Indeed, it would be a much closer question if the prosecutor had not sought to create a false impression at closing argument. But the question of whether, in isolation, Yancy's uncorrected or unclarified cross-examination testimony would justify reversal is not before us in this case, and we decline to address it as though it had been presented in that fashion.

[10] We note that the prosecutor's duty to correct false or misleading testimony particularly arises in those instances in which law enforcement has directly participated in the subject matter of the testimony. Such participation would typically arise for purposes of this duty in the context of plea negotiations or other agreements for cooperation and testimony involving the prosecutor's office and others. Such participation may also arise when, as here, the prosecutor has direct knowledge of an agreement for cooperation between law enforcement and other persons concerning the particular case at hand.

[11] We disagree with the dissent that we "now hold[] prosecutors to the unacceptably high and extraordinarily ambiguous standard of having to correct every instance of mistaken, inaccurate, or incomplete testimony or risk the possibility that every possible or perceived contradiction will be rendered material." *Post* at 2. We respectfully submit

## B. ERROR AFFECTING THE JUDGMENT OF THE JURY

Whatever Yancy may have believed about the truth of his testimony, we conclude both that it conveyed a serious misimpression about the nature of his involvement in the case and that the prosecutor's exploitation of that testimony violated the defendant's right to due process. For this reason, we disagree with the Court of Appeals that this violation does not warrant relief. Rather, in light of the effect that Yancy's uncorrected testimony had on his credibility and the role that credibility played in securing the defendant's convictions, we conclude that there is a "reasonable likelihood" that the false impression resulting from the prosecutor's exploitation of the testimony affected the judgment of the jury. *Napue*, 360 US at 271. Accordingly, the defendant is entitled to a new trial.

As noted, there was no physical evidence tying the defendant to the crime. No murder weapon was ever recovered, the defendant's fingerprints were not found at the scene, and no other physical evidence confirmed that he had ever been at Pass's house. The defendant was convicted solely on the testimony of Lard and Yancy, two witnesses with significant credibility issues. As the jury was made aware, Lard was testifying

---

that the dissent has mischaracterized and broadened the proper understanding of our opinion. As we emphasize above, a prosecutor need not correct every instance of mistaken or inaccurate testimony, *Martin*, 59 F3d at 770, nor must he or she "play the role of defense counsel, and ferret out ambiguities in [the] witness's responses on cross-examination," *Harris*, 498 F2d at 1169. Indeed, it is on the basis of the prosecutor's exploitative tactics in this case that we conclude that she had and then breached her duty to correct the false impression she created. Accordingly, to be absolutely clear, we do not hold today that the prosecutor has a limitless obligation to correct every instance of false or misleading testimony, regardless of its subject matter.

14

pursuant to a favorable plea agreement for his role in the crime,[12] and his testimony at trial proved inconsistent not only with Yancy's version of events, but with his own pretrial account.[13]

Yancy's account of the crime was also riddled with inconsistencies[14] and did not otherwise cast him in a particularly favorable light. First, while Yancy admitted at trial that he and the victim "had a kind of personal bond," he also admitted that he did not call an ambulance or the police while the victim was "gurgling off his blood" on the floor after being shot, instead leaving the house with the defendant and Lard to go share some

---

[12] Lard agreed to testify after spending approximately two years in jail awaiting trial for his part in Pass's murder. Lard was charged with felony murder, armed robbery, and other gun-related offenses, and as he acknowledged during his testimony, he was facing a mandatory life sentence on those charges. See MCL 750.316(1) (mandatory life imprisonment without parole for first-degree murder). Pursuant to his plea agreement, these charges were dismissed, and Lard pleaded guilty to reduced charges of manslaughter, MCL 750.321, and unarmed robbery, MCL 750.530(1), each of which carried the possibility of probation.

[13] For example, Lard claimed in a pretrial statement to police that the defendant took a gun from Pass, but testified at trial that he did not see the defendant with a gun at any time. Lard also initially denied being at Pass's house on the night of the shooting. Moreover, Lard insisted that Yancy was a liar; Yancy testified that Lard had pulled a gun out of his sweatshirt, but Lard denied ever possessing one.

[14] Yancy initially told police officers that the defendant was the only one with a visible weapon. He then contradicted that statement both at the preliminary examination, when he testified that he never saw the defendant with a gun, and at trial, when he testified that it was Lard whom he saw with a gun. Yancy also testified at the preliminary examination that he had not consumed any drugs at Pass's house before the shooting, though he admitted at trial that he had. Similarly, he admitted at trial using some of Pass's drugs with the defendant and Lard after the shooting, though he had claimed at the preliminary examination that they never "gave" him any of those drugs (explaining at trial that he considered "giving" drugs to be different from "sharing" them).

15

of the victim's cocaine.  Yancy acknowledged that he then promptly disappeared from town for approximately a year.  Furthermore, Yancy admitted, and Lard confirmed, that Yancy and the defendant had "a little beef going on" at the time of the murder, arising from a violent dispute over money a few weeks earlier.

There was, therefore, a basis for skepticism about both Lard and Yancy.  What is most significant for our assessment, however, is that, as far as the jury knew, Yancy was uniquely credible in one respect: he was the sole lay witness who did not directly benefit from his participation in the case.  Unlike Lard, he was not facing charges in connection with Pass's murder, and according to his testimony, he had not been compensated for testifying and had no paid connection with the defendant's case.  Of course, Yancy did receive at least one known direct benefit for his participation in the case—financial compensation.  But the prosecutor exploited the false impression to the contrary, urging the jury to believe Yancy—and convict the defendant—because of it.  Given that the prosecution's case hinged entirely on the jury's credibility assessment of Lard and Yancy, this emphasis on the one (albeit false) indication of the difference in trustworthiness between them is unsurprising.  For the same reason, however, we cannot overlook its prejudicial effect.  See *Wiese*, 425 Mich at 456 (concluding, in a case that "depended almost entirely on [the falsely testifying witness's] testimony," that the use of the false testimony and the defendant's resulting inability to properly question the witness's credibility "reasonably could have affected the judgment of the jury").

In concluding that this prejudice was too insignificant to warrant relief, the Court of Appeals stressed that the impression that he had not been compensated could not have "bolstered" the "fairly dreadful state of Yancy's credibility . . . ."  *Smith*, unpub op at 5.

16

We agree that Yancy lacked credibility in a number of respects unrelated to his role as a paid informant. But we disagree with the Court of Appeals that the *impossibility* of raising Yancy's credibility from an already "dreadful state" is an appropriate way to frame the critical issue. Instead, the question is what effect would likely have resulted if the jury had understood that Yancy was compensated for his information against the defendant. In our view, this unique additional impeachment evidence was not cumulative or immaterial. See *Napue*, 360 US at 270 ("[W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against [the defendant] turned what was otherwise a tainted trial into a fair one."); *Reynoso v Giurbino*, 462 F3d 1099, 1117 (CA 9, 2006) ("Unlike the other evidence used to impeach the eyewitnesses . . . such as inconsistent statements and general attacks on their credibility, evidence of their financial motives would have established a real incentive to lie, explaining *why* their testimony may have been fabricated."). Rather, there is good reason to believe that if the jury had been made aware that Yancy was compensated for his cooperation, the prosecution would have had a more difficult task persuading the jury that he should be believed.

Put simply, the "dreadful state" of Yancy's credibility would have been even more dreadful had the jury learned that he was paid for his information against the defendant. And contrary to the Court of Appeals' suggestion, the prejudice from the prosecutor's exploitation of Yancy's potentially misleading testimony cannot be discounted simply because the jury had other reasons to disbelieve Yancy. Indeed, this case demonstrates the opposite to be true. Presented with a witness who was revealed to be a regular drug user, to have been in a dispute with the defendant about money, to have taken the

17

victim's drugs, to have left the victim "gurgling off his blood" on the floor, and to have then left town for a year, the jury was more likely to have viewed the false inference that Yancy was not compensated at all for his involvement as the most significant basis for crediting his testimony against the defendant.[15]

Due process required that the jury be accurately apprised of the incentives underlying the testimony of this critical witness, and plainly that the prosecution not exploit any confusion relating to this critical topic. See *United States v Cervantes-Pacheco*, 826 F2d 310, 315 (CA 5, 1987) ("As in the case of the witness who has been promised a reduced sentence, *it is up to the jury* to evaluate the credibility of the compensated witness.") (emphasis added). Given the centrality of Yancy's credibility to the prosecution's case and the dearth of other evidence supporting the defendant's convictions, we hold that there was a reasonable likelihood that the prosecutor's exploitation of Yancy's misleading testimony affected the judgment of the jury.

---

[15] The dissent argues that the defendant has forfeited his claim of error because he failed to object at trial and concludes therefore that the defendant's claim must be reviewed under the plain-error standard rather than *Napue*'s standard for reversal. While we are not convinced that plain-error analysis applies to *Napue* errors, we disagree with the dissent's conclusion that the defendant's claim does not meet that standard. As outlined above, (1) an error clearly occurred in this case, (2) that error was "clear and obvious" insofar as the jury was left with a false impression of Yancy's involvement, and (3) the error clearly affected substantial rights insofar as we find that it had a "reasonable probability" of affecting the jury's verdict. Furthermore, an error like this, in which the prosecutor deliberately exploited misleading evidence before the jury, clearly affects "the fairness, integrity or public reputation of judicial proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), quoting *United States v Olano*, 507 US 725, 736; 113 S Ct 1770; 123 L Ed 2d 508 (1993) (quotation marks omitted).

18

## IV. CONCLUSION

For the foregoing reasons, we conclude that the defendant is entitled to a new trial. Accordingly, we reverse the judgment of the Court of Appeals in part, vacate the defendant's convictions, and remand this case for proceedings consistent with this opinion.

Bridget M. McCormack
Robert P. Young, Jr.
Stephen J. Markman
David F. Viviano
Richard H. Bernstein (except
   for footnote 5)

19

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                              No. 148305

FERONDA MONTRE SMITH,

Defendant-Appellant.

_____

BERNSTEIN, J. (*concurring in part and dissenting in part*).

I concur with the majority opinion except for footnote 5. With respect to defendant's speedy-trial claim, I respectfully disagree with the majority's conclusion that defendant is not entitled to relief. Instead, I concur with Part II of Justice KELLY's partial concurrence and partial dissent. Accordingly, I would also reverse the judgment of the Court of Appeals with respect to the speedy-trial claim and remand this case to the trial court to consider whether the prosecution overcame the presumption of prejudice to defendant's person and defense.

Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                  No. 148305

FERONDA MONTRE SMITH,

        Defendant-Appellant.

_____

KELLY, J. (*concurring in part and dissenting in part*).

I concur in the result of the majority's opinion with respect to the issue of Yancy's false testimony. It is reasonably likely that Yancy's uncorrected false testimony affected the judgment of the jury; therefore, a new trial is warranted. I part ways with the majority to the extent that it would grant a new trial simply for "substantially misleading" testimony of a material witness that need not rise to the level of falsity and, further, dissent from the majority's resolution of defendant's speedy-trial issue.

## I.  FALSE TESTIMONY

I would grant a new trial on the basis of the false evidence in the form of Yancy's testimony, which was "uncorrected when it appear[ed]" during defendant's trial.[1] The United States Supreme Court has long held that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . ."[2] The majority

_____

[1] *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959).

[2] *Id.*

expands the "false evidence" standard by allowing a new trial on the basis of "substantially misleading" evidence in the form of testimony.[3] This standard is unworkable for the reasons articulated by Justice ZAHRA: it allows a reviewing court to "pick[] and choose[] small snippets of testimony"[4] to determine the " 'overall impression' " that those small snippets create.[5] I would simply examine whether the prosecutor knowingly proffered false testimony. By attempting to decipher the "overall impression" particular snippets of testimony made on the jury, and by potentially requiring prosecutors to correct testimony that might not *actually* be false, the majority creates an ambiguous standard that will be difficult to apply in practice.

Nevertheless, applying the traditional standard to this case, I agree with the majority that defendant is entitled to a new trial. Yancy's testimony was, in fact, false. The Court of Appeals explained that "[o]n direct, cross, and redirect examination, Yancy repeatedly admitted that he was paid for cooperating with law enforcement but repeatedly denied that any of the payment pertained to the instant case."[6] Moreover, the prosecutor "did not exercise the opportunity to clarify" that Yancy "did receive payment for

---

[3] Although the majority cites *United States v Harris* for its "substantially misleading" standard, the full quotation from *Harris* equates substantially misleading testimony with testimony that "is untrue." *United States v Harris*, 498 F2d 1164, 1169 (CA 3, 1974). Moreover, the testimony in *Harris* was, in fact, false, not just "substantially misleading." See *id*. at 1166-1168.

[4] *Post* at 13 (ZAHRA, J., dissenting).

[5] *Post* at 10, quoting *ante* at 9 (opinion of the Court).

[6] *People v Smith*, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2013 (Docket No. 304935), p 5.

2

information pertaining to the case."[7] For the reasons stated by the majority, I agree that this false—not just substantially misleading—testimony was prejudicial and warrants a new trial.

## II. RIGHT TO A SPEEDY TRIAL

Although defendant is entitled to a new trial on the basis of false testimony, I would not simply remand for a new trial but would also remand for additional factual findings related to defendant's speedy-trial claim, and I respectfully dissent from the majority's conclusion that defendant is not entitled to any relief on this claim. The Court of Appeals acknowledged that the circuit court did not correctly apply the *Barker v Wingo*[8] balancing test to assess defendant's speedy-trial claim after his trial was delayed for 41 months.[9] Specifically, the circuit court did not "follow[] the rule that after a delay of 18 months, prejudice is presumed,"[10] and the Court of Appeals likewise did not properly examine the extent to which the circuit court's analysis was influenced by its failure to require the prosecution to rebut the presumption of prejudice. I would therefore reverse the judgment of the Court of Appeals, vacate defendant's convictions, and remand this case to a new judge in the Genesee Circuit Court to consider whether the

---

[7] *Id.*

[8] *Barker v Wingo*, 407 US 514, 530-533; 92 S Ct 2182; 33 L Ed 2d 101 (1972).

[9] See *Smith*, unpub op at 3.

[10] *People v Grimmett*, 388 Mich 590, 606; 202 NW2d 278 (1972), citing *People v Den Uyl*, 320 Mich 477; 31 NW2d 699 (1948). *Grimmett* was overruled in part on other grounds by *People v White*, 390 Mich 245, 258; 212 NW2d 222 (1970), which was in turn overruled by *People v Nutt*, 469 Mich 565, 596; 677 NW2d 1 (2003).

3

prosecution overcame the presumption of prejudice to defendant's person and defense.[11] If the presumption was overcome, a new trial is warranted on the basis of the reasoning provided in the majority opinion. However, if the presumption of prejudice to defendant's person and defense was *not* overcome, a dismissal of all charges is the only remedy for a speedy-trial violation.

The right to a speedy trial is enshrined in the United States Constitution:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . .[12]

The United States Supreme Court has held that the right to a speedy trial serves "to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself."[13]

---

[11] *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972) ("There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense. Prejudice to his person would take the form of oppressive pretrial incarceration leading to anxiety and concern. Prejudice to his defense might include key witnesses being unavailable. Impairment of defense is the most serious, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.") (quotation marks and citation omitted).

[12] US Const, Am VI; see also Const 1963, art 1, § 20 ("In every criminal prosecution, the accused shall have the right to a speedy and public trial . . . ."). This assurance is further codified in MCL 768.1.

[13] *United States v Marion*, 404 US 307, 320; 92 S Ct 455; 30 L Ed 2d 468 (1971) (quotation marks and citation omitted).

4

There is no bright-line rule that indicates a "fixed number of days" that must pass before a defendant's right to a speedy trial is violated.[14] Instead, this Court applies the balancing test established by the United States Supreme Court in *Barker v Wingo*[15] in light of this Court's presumption of prejudice "after a delay of 18 months."[16] In *Barker*, the United States Supreme Court identified as some of the factors to be considered (1) the length of the delay, (2) the justification for the delay, (3) the defendant's assertion of his or her right, and (4) the multifaceted prejudice to the defendant.[17] The *Barker* test is case-specific, and none of the four factors is dispositive.[18] In assessing the prejudicial effect of a delay on a defendant, the United States Supreme Court has observed that "[t]he time spent in jail," as opposed to time released on bond, "has a detrimental impact on the individual."[19]

Defendant waited in prison for 41 months before being brought to trial. The circuit court's analysis of these delays inexplicably attributed extensive delays by the court to defendant.[20] As a result, despite a total delay exceeding 18 months at the time of

---

[14] *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006).

[15] *Grimmett*, 388 Mich at 605-606 (adopting the *Barker* test).

[16] *Id*. at 606.

[17] *Barker*, 407 US at 530.

[18] *Id.* at 533.

[19] *Id*. at 532.

[20] For example, it was the court that failed to respond to defendant's motion to quash for more than seven months and delayed a response to defendant's first motion for a speedy trial for almost five months. Both delays were attributed to defendant, presumably because he was the source of the timely filed motions. Additionally, defendant is

defendant's first motion for a speedy trial, the court found that *defendant* had not established prejudice because the total delay *by the state* was less than 18 months. On appeal almost 25 months after defendant's first motion for a speedy trial, the Court of Appeals recognized that the circuit court had misunderstood the *Barker* prejudice prong, observing that "irrespective of whether defendant or the prosecution is more at 'fault' for the 41-month delay here, the simple fact is that the delay *was* 41 months, and consequently the burden is on the prosecution to show that there was no prejudice."[21] However, the Court of Appeals found no error in the circuit court's independent inquiry into prejudice because its independent inquiry was not tainted by its misapprehension of the law.[22]

Contrary to the Court of Appeals' conclusion, the circuit court's prejudice inquiry *was* tainted by its misapprehension of applicable law. In *People v Collins,* this Court established that "[a]fter 18 months, the burden shifts to the prosecution to show there was no injury [to the defendant's person or defense]."[23] No prosecutorial evidence

---

allegedly a member of a gang and was indicted along with numerous other codefendants, also alleged gang members, allegations that rendered defendant's case so complex, according to the circuit court and the prosecutor, as to account for a 3½-year delay.

[21] *Smith*, unpub op at 3; see also *Doggett v United States*, 505 US 647, 652 n 1; 112 S Ct 2686; 120 L Ed 2d 520 (1992) ("Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year.").

[22] *Smith*, unpub op at 4 n 1.

[23] *Collins*, 388 Mich at 695.

overcoming the presumption of prejudice appears on the record.[24] By failing to fully engage in the "difficult and sensitive balancing process" established in *Barker*, and therefore failing to impose the proper burden on the prosecution, the circuit court did not afford defendant the complete protection of his constitutional right to a speedy trial.[25] In other words, the Court of Appeals' decision is "irreconcilable with . . . the original meaning of the Sixth Amendment . . . ."[26] Because the Court of Appeals did not afford defendant the presumption to which he is entitled, I would reverse the judgment of the Court of Appeals, vacate defendant's convictions, and remand this case to a new judge in the Genesee Circuit Court for the correct application of the relevant law. Final disposition of defendant's speedy-trial claim should await the prosecution's showing that defendant was not prejudiced by the delay and the circuit court's correct application of the remaining *Barker* factors.

Mary Beth Kelly
Richard H. Bernstein (with
   respect to Part II only)

---

[24] See *People v Davis*, 123 Mich App 553, 561; 332 NW2d 606 (1983) ("After 18 months, the *prosecution* has the burden of showing that the defendant was not prejudiced by the delay. The people have not even attempted to show that defendant was not prejudiced. Consequently, we conclude that the defendant was prejudiced by the 31-month delay between his arrest and conviction.") (emphasis added) (citations omitted).

[25] *Barker*, 407 US at 533.

[26] *Alleyne v United States*, 570 US ___, ___ n 5; 133 S Ct 2151, 2163 n 5; 186 L Ed 2d 314 (2013); see also *Barker*, 407 US at 533 ("[B]ecause we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.").

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                       No. 148305

FERONDA MONTRE SMITH,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

The majority concludes that reversal of defendant's felony-murder and armed-robbery convictions is required because the prosecutor failed to meet her duty to correct "substantially misleading, if not false," testimony from Mark Yancy regarding the compensation paid to him by the Federal Bureau of Investigation (FBI) for information and cooperation. The objection to the prosecutor's conduct is premised in the notion that the "State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . ." *Ante* at 7 (quotation marks and citation omitted). I agree with this fundamental proposition, and imagine that no one denies it. But today the majority has turned this rudimentary constitutional principle into a new requirement that the prosecutor not just elicit truthful testimony on direct examination, but also elicit complete testimony, fully disclosing all the facts and circumstances of how that witness came to testify. Further, the majority imposes an additional duty on the prosecutor to correct a defense attorney's mischaracterized questions made during cross-examination of a state's witness.

The record is clear that Yancy admitted being paid by the FBI for his cooperation. Nonetheless, despite the prosecutor's having elicited testimony from Yancy that he had been paid for his cooperation, the majority vacates defendant's convictions because the prosecutor did not make it absolutely clear to the jury that the FBI paid Yancy for his cooperation in the government's case against defendant. I respectfully dissent because I fear the majority now holds prosecutors to the unacceptably high and extraordinarily ambiguous standard of having to correct every instance of mistaken, inaccurate, or incomplete testimony or risk the possibility that every possible or perceived contradiction will be rendered material.[1]

---

[1] I hope my fear is unfounded, as suggested by the majority in footnote 9 of its opinion. There, the majority suggests that it is the prosecutor's exploitation of a "false impression" during closing argument that justifies reversal. While I take issue with the majority's characterization of the prosecutor's conduct, if this is the majority's position, it should have said that and no more.

But even if the rule announced by the majority today is intended as a narrow one, as emphatically stated by the majority, the opinion remains rife with directives that a prosecutor must do more than refrain from knowingly arguing to the jury facts known to be untrue. Instead, the majority imposes on the prosecution the burden to do more than ensure that testimony elicited on direct examination is truthful; that testimony must now be truthful and complete. And it also imposes on the prosecution an obligation to correct misguided testimony that a reviewing court might later declare to be "substantially misleading," even when that testimony is the product of defense counsel's cross-examination and when, as here, defense counsel is fully aware that the testimony is misleading, has all the information needed to effectively cross-examine the witness on this point, and, as a matter of trial strategy, elects to let that testimony stand.

So if, as the majority states, my fear of the breadth of the majority opinion is overblown, it nevertheless seems to be fully justified and anchored in the various broad statements scattered throughout its opinion that are not congruent with the majority's claim that it announces a narrow rule.

2

The majority's claim of error is predicated on the broad proposition "that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' "[2] Along these lines, a state may not knowingly use false evidence, including false testimony, or solicit false evidence or testimony and allow it to go uncorrected when it appears, to obtain a tainted conviction.[3] This Court has recognized that "[t]he prosecution's duty to correct the false testimony of a state witness arises 'when [the false testimony] appears.' "[4]

Each of these principles is sound when one understands how they have been developed and applied. In each case enunciating these principles, neither defense counsel nor the trial court was aware that the state had agreed to compensate witnesses for their testimony because the prosecution did not disclose the agreements. This, however, is not a case in which the prosecutor kept secret the compensation the FBI paid to Yancy for his cooperation. Rather, the existence and extent of Yancy's relationship with the government and the details regarding the compensation paid to Yancy were fully disclosed and known not only to the prosecutor, but also to defense counsel and the trial court long before trial commenced. For this reason, I conclude that the evidence the majority finds to be false or "substantially misleading" is better characterized as

---

[2] *Giglio v United States*, 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972) (citation omitted).

[3] *Ante* at 7, citing *Napue v Illinois*, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959).

[4] *People v Wiese*, 425 Mich 448, 455; 389 NW2d 866 (1986), quoting *Napue*, 360 US at 269.

3

incomplete testimony. Accordingly, I conclude that the prosecutor did not commit an error by failing to clarify the evidence in the manner espoused by the majority. Similarly, I do not conclude that the prosecutor's closing argument was an improper exploitation of misleading testimony. To the extent that the prosecutor's actions constituted error, that error was either extinguished by defendant's waiver, forfeited for lack of preservation, or harmless. I would affirm defendant's convictions.

## I. THE SUPREME COURT CASES RELIED ON BY THE MAJORITY ARE DISTINGUISHABLE

The majority relies principally on *Napue v Illinois*, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959), *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972), and *People v Wiese*, 425 Mich 448, 453-454; 389 NW2d 866 (1986), to support the proposition that reversal is required in this case. All these cases involved witnesses who denied under oath receiving of any remuneration from the government in exchange for their testimony. It is significant, in my view, that in each case the denial of remuneration was clearly and patently false and, more importantly, that this falsity was known only by the prosecution.

Unlike the key prosecution witnesses in *Napue*, *Giglio*, and *Wiese*, Yancy admitted receiving compensation for his cooperation with the FBI. Moreover, as distinguished from *Napue*, *Giglio*, and *Wiese*, in the instant case it was not a secret that Yancy received compensation from the FBI in exchange for his cooperation. In stark contrast to *Napue*, *Giglio*, and *Wiese*, here there was a pretrial proceeding held for the

4

benefit of defense counsel[5] during which the prosecution presented FBI Special Agent Dan Harris, who was charged with the responsibility of compensating informants. Defense counsel participated in this hearing, which was presided over by the trial court. During the hearing it was fully disclosed that Yancy had received $4,000 for information related to the Pierson Hood gang and for information that led to the charges against defendant.[6]

The fact that the trial court and defense counsel were made aware before trial of the consideration given Yancy for his cooperation with the FBI materially distinguishes this case from *Napue*, *Giglio*, and *Wiese*. This disclosure is fundamental. It is the

---

[5] Specifically, defense counsel made a discovery request seeking

> [c]opies of any and all written and/or electronically recorded agreements for the payment of funds by the FBI and any other police agency to any cooperating witness in this cause, including, but not limited to, Mark Yancy and Tarence Lard [a codefendant in this case], and logs and other records pertaining to such payments. A summary of the content of any oral agreements is also requested.

As a result of this discovery request, the trial court conducted the evidentiary hearing at which FBI Special Agent Dan Harris testified.

[6] Defendant was on trial for the murder of Larry Pass. The majority minimizes the fact that the compensation paid to Yancy was not exclusively for information related to the Pass homicide. In fact, the main focus of the FBI investigation was the Pierson Hood gang and, as Harris testified, Yancy's compensation was due in significant part for his cooperation relating to the gang activity. Importantly, the record reveals that defense counsel wanted to avoid at all costs any reference to the Pierson Hood gang to ensure that the jury never learned of defendant's ties to gang activity. See footnote 17 of this opinon. Therefore, it is entirely possible that the prosecutor did not develop the full extent of Yancy's compensation agreement with the FBI in order to accommodate defense counsel's strategy of distancing defendant from the highly publicized Pierson Hood gang.

secreting of evidence that is offensive to due process.[7]  As noted in *Giglio,* "When the 'reliability of a given witness may well be determinative of guilt or innocence,'

[7] The majority accuses me of conflating the prosecution's obligation to disclose exculpatory information under *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), with the duty to correct false testimony under *Napue*, 360 US at 269.  The United Stated Supreme Court has stated, however, that "[t]he rule of *Brady . . .* arguably applies in three quite different situations" and that "[e]ach involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense."  *United States v Agurs*, 427 US 97, 103; 96 S Ct 2392; 49 L Ed 2d 342 (1976).  The Supreme Court observed that one of these situations arises when "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury."  *Id*.  The Court, citing *Napue* and *Giglio*, then stated that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair."  *Id*.  The majority here has created a new rule that wholly separates the duties under *Napue* from those under *Brady* even though the duties are inextricably linked.  The United States Supreme Court has recognized this, stating that each *Brady* situation, including those having claims under *Napue* and *Giglio*, involves information known by the prosecution but unknown to defense counsel.

While there may be circumstances in which the prosecution has complied with *Brady* yet failed to meet an overriding duty to correct a witness's perjured testimony, we ought not let appellate hindsight decouple *Brady* from *Napue* in cases in which it is clear that defense counsel was aware that the testimony was arguably misleading and yet declined  to clarify it for the jury.

The majority attemptes to decouple *Brady* from *Napue* by citing three federal cases: *DeMarco v United States*, 928 F2d 1074, 1076-1077 (CA 11, 1991), *United States v Sanfilippo*, 564 F2d 176, 178-179 (CA 5, 1977), and *Jenkins v Artuz*, 294 F3d 284, 296 (CA 2, 2002).  The majority's reliance on these cases is seriously misplaced.  To begin with, *DeMarco* involved actual perjured testimony, while the instant case involves, at best, "substantially misleading testimony."  Further, a more recent case from the United States Court of Appeals for the Eleventh Circuit, *Routly v Singletary*, 33 F3d 1279, 1286 (CA 11, 1994), concluded that when "testimony concerning [a witness's] understanding was, at worst, equivocal, [it was] not so misleading as to require corrective action by the state."  Further, while *Routly* expressly acknowledged *DeMarco*, it nonetheless held that "[t]here is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object."  *Id*.

Similarly *Sanfilippo*, was quickly distinguished within its own circuit.  See *United States v Antone*, 603 F2d 566, 571 (CA 5, 1979).  Interestingly, in *Beltran v Cockrell*, 294

*nondisclosure of evidence affecting credibility* falls within this general rule."[8]  If disclosure of evidence affecting credibility is timely made, the witness's credibility should be left to the adversarial process.  Indeed, "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free."[9]  Our adversarial system of justice "is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question."[10]  Under our adversarial system, however, each party bears the responsibility for ensuring that its positions are vigorously and properly advocated.[11]  And "[a]lthough

F3d 730, 736-737 (CA 5, 2002), the United States Court of Appeals for the Fifth Circuit explained that "[t]he *Sanfilippo* court did not deal with the situation presented here, where the prosecution used the false testimony *consciously allowed by the defense as part of a legal strategy*."  (Emphasis added.)  Likewise, defense counsel in this case chose as part of his trial strategy to ignore Yancy's testimony and instead represent to the jury that Yancy and the prosecution had a tacit agreement that Yancy would not be charged for any crime in exchange for his testimony against defendant.

Finally, the majority's reliance on *Jenkins* is misplaced because that court expressly stated that defense counsel, unlike defense counsel in this case, had not relied on the witness's problematic testimony to advance a strategic or tactical omission at trial.  In sum, the cases the majority cites are easily distinguishable.  Moreover, the majority uses these cases for a proposition that has been rejected by more recent cases in those same circuits.  In fact, a majority of federal courts have rejected the rule the majority now invokes.  See footnote 18 of this opinion.

[8] *Giglio*, 405 US at 154, quoting *Napue*, 360 US at 269 (emphasis added).

[9] *Herring v New York*, 422 US 853, 862; 95 S Ct 2550; 45 L Ed 2d 593 (1975).

[10] *Penson v Ohio*, 488 US 75, 84; 109 S Ct 346; 102 L Ed 2d 300 (1988) (quotation marks and citations omitted).

[11] See *Napier v Jacobs*, 429 Mich 222, 228-229; 414 NW2d 862 (1987).

7

the judge plays a vital role in the trial of a criminal case, counsel for the parties are also essential components" because "[t]hey too share in the cause of justice."[12]

In cases in which the defendant claims that the prosecution has left unchecked questionable testimony from a witness, a reviewing court must assess whether the evidence was truly false and material to the proceedings or merely inaccurate, incomplete, or otherwise vague or ambiguous such that the discrepancy is immaterial.[13] As observed by the majority, "it is the *effect* of a prosecutor's failure to correct false testimony that 'is the crucial inquiry for due process purposes.' "[14] If the evidence in question was disclosed to the defense in a timely manner, this disclosure should weigh in favor of a finding of immateriality. When all parties to the litigation are aware of the material facts, the adversarial process will separate the wheat from the chaff, leaving all material and pertinent information before the jury.[15]

---

[12] *United States v Harris*, 498 F2d 1164, 1170 (CA 3, 1974).

[13] See *United States v Martin*, 59 F3d 767, 770 (CA 8, 1995) (noting that the prosecutor need not correct every instance of mistaken or inaccurate testimony); *Harris*, 498 F2d at 1169 (stating the prosecutor need not "play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination").

[14] *Ante* at 7, quoting *Smith v Phillips*, 455 US 209, 220 n 10; 102 S Ct 940; 71 L Ed 2d 78 (1982).

[15] This is not to say that if disclosure of evidence affecting credibility occurred at some point in the pretrial process the prosecution is forever free from the obligation to correct patently false testimony offered by a prosecution witness. There will be some instances in which the false evidence will be so evident and irreconcilable with the truth that action by the prosecutor to effectuate an immediate and complete correction of the record will be required. But those instances will be rare, and that is not the case here.

## II. THE ALLEGED "SUBSTANTIALLY MISLEADING" EVIDENCE PRESENTED BY THE PROSECUTOR WAS NOT ONLY DISCLOSED, IT WAS AT MOST INCOMPLETE AND THEREFORE IMMATERIAL

Examination of the testimony elicited by the prosecutor reveals no patent falsity. The majority takes issue with two questions[16] from the prosecutor during Yancy's direct examination:

> [*Prosecutor*]: Now, you've been paid by a federal agency for cooperation. Is that correct?
>
> [*Yancy*]: Yes.
>
> \* \* \*
>
> [*Prosecutor*]: Were you paid for your testimony in this case?
>
> [*Yancy*]: No.

The majority does not allege that either question and its respective response, taken individually, constituted the solicitation of false or misleading evidence. This is clearly because the responses to both questions are true. Yancy was paid for his cooperation, but he was not paid for his testimony. At most the majority takes issue with the prosecutor's use of the phrase "federal agency," framing that language as clear evidence the prosecutor purposefully attempted to distance the witness from the defendant and

---

[16] The parties understood that testimony relating to the Pierson Hood gang would not be admitted absent defense counsel's opening the door to such testimony. See footnote 17 of this opinion. This explains why the testimony is scant with regard to Yancy's compensation. It appears from the record that Yancy's cooperation in the investigation of the Pass homicide was limited to an interview in 2006 with Flint police officer Shawn Ellis. Thereafter, the FBI continued its investigation into the gang-related activity. We are not informed of the extent of Yancy's cooperation with regard to the Pierson Hood investigation, but we know that the FBI did not compensate witnesses until the FBI no longer needed the witness's cooperation. Yancy was compensated in the fall of 2008. This case did not go to trial until the spring of 2011.

9

purposefully obfuscated the fact that Yancy had been compensated for information provided to the FBI. The majority uses innuendo and isolated phrases such as "federal agency" to somehow determine that "[t]he overall impression [with regard to Yancy's compensation] conveyed was false."

In reality, any misdirection with regard to the compensation paid by the FBI to Yancy was created not by the prosecutor but by defense counsel during Yancy's cross-examination:

> [*Defense Counsel*]: Do you deny -- first of all, it sounds like you agreed that you were paid $4,500 for cooperating with law enforcement, correct?
>
> [*Yancy*]: Correct.
>
> [*Defense Counsel*]: But you deny that it was with regards to this case, correct?
>
> [*Yancy*]: Correct.

On the basis of this response, the majority claims that Yancy denied that he was compensated for his "cooperation with the defendant's formal prosecution." But Yancy was not asked whether he was compensated for his cooperation in the Pass murder investigation; he was asked whether he was compensated "with regards to this case." Yancy might well have believed that his compensation was not "with regards to this case," but was instead for his cooperation in the Pierson Hood gang case. Further, Yancy had just been asked if he had been paid for his testimony in this case. It would be reasonable for Yancy to assume that defense counsel was referring to his specific testimony.

10

Admittedly, neither the prosecutor nor defense counsel made this clarification. Instead, the prosecutor again asked Yancy to confirm that the compensation he received was not for his trial testimony. It is the prosecutor's failure to clarify the distinction between compensation for information and compensation for testimony—a confusion brought on by defense counsel's cross-examination—that the majority finds offensive. More specifically, the majority believes that the prosecutor was under a duty to expressly elicit testimony from Yancy that he was compensated for providing information that implicated defendant for the murder. This failure, says the majority, rendered the prosecutor's examination either false or substantially misleading.

If this were a case in which the prosecution alone was aware that Yancy was compensated for information that ultimately led to the charges against defendant, I might well have joined the majority opinion. This is not such a case. Defense counsel was fully aware of the specifics underlying the compensation the FBI paid Yancy. Accordingly, defense counsel had in his arsenal all the information necessary to cross-examine Yancy with regard to the incomplete, albeit truthful, testimony elicited by the prosecutor. Importantly, defense counsel conducted a vigorous and effective cross-examination:

> [*Defense Counsel*]: But it was money, right? Real money, right?
>
> [*Yancy*]: Correct.
>
> [*Defense Counsel*]: For cooperating, correct?
>
> [*Yancy*]: Correct.
>
> [*Defense Counsel*]: With these folks, correct?
>
> [*Yancy*]: Correct.

11

[*Defense Counsel*]: And you got some other benefits, too. Isn't that right?

[*Yancy*]: No.

[*Defense Counsel*]: Okay. Well, are you in prison or jail now?

[*Yancy*]: Because I didn't do nothing.

[*Defense Counsel*]: That's not my question.

[*Yancy*]: No I'm not.

[*Defense Counsel*]: You're not in prison or jail now. Okay. You weren't charged with murder or weapons possession, correct?

[*Yancy*]: I didn't have a weapon, no.

[*Defense Counsel*]: That's not my question.

[*Yancy*]: No.

[*Defense Counsel*]: Okay. You were not charged with drug charges, right?

[*Yancy*]: No.

[*Defense Counsel*]: I mean you delivered cocaine in the house, right? You handed it to these guys and then you shared it, so you delivered it or at the least used it, right? Didn't get charged with any of that stuff, right?

[*Yancy*]: No.[17]

---

[17] Defense counsel did not highlight why the FBI paid Yancy. As later revealed during a discussion outside the presence of the jury, he had good reason to stay away from this topic:

> *The Court*: The jury is yet to be called for. Are we ready for our jurors?
>
> [*Defense Counsel*]: No. There was just one issue that I wanted to get your opinion on one way or the other before I start my cross-examination and that is this. Listening to the detective, and it's no secret there was an interview of Yancy in '06, in the summer of '06 if I understood his testimony. My client wasn't arrested until December of '07. If I ask the

The majority picks and chooses small snippets of testimony to determine that the prosecutor had evil intent to obfuscate the evidence and confuse the jury. This could not be further from the truth. The prosecutor made a timely pretrial disclosure of the evidence affecting Yancy's credibility. The prosecutor elicited only true testimony from

---

officer to confirm, I won't be asking the officer why, but if I ask the officer to confirm when my client was arrested, am I opening the door to Pierson Hood? I don't think I am, but if you think I am, I'm not doing it. So, I need to know.

[*Prosecutor*]: Your Honor, the reason that there was a delay was because of the Pierson Hood investigation. So, if he wants to go there, it seems to me that it's only fair that we don't make Sgt. Ellis look like he wasn't doing anything. I mean --

*The Court*: Yeah, we would have to supply the context. I don't see it as being particularly beneficial. We've already indicated, I think there's been indication that Lard wasn't arrested until '07 for an '05 homicide. It would certainly suggest -- if it is the delay in an arrest the defendant is seeking to elicit from the officer, then an explanation for the delay in arrest would be certainly forthcoming. Frankly, I think it's much, much more hazardous for any gain that's going to be made.

[*Defense Counsel*]: All right. I'm not going to get into it.

*The Court*: Yeah. All right.

Defense counsel's trial strategy was to avoid "opening the door to Pierson Hood" because, as the trial court noted, doing so would be hazardous to defendant's case. Rather, defense counsel sought to impeach Yancy's claim that he was not paid "with regards to this case" by suggesting that Yancy had received some tacit benefit from the prosecution for his testimony and cooperation.

Further, it appears that an integral part of defense counsel's trial strategy was to avoid mentioning Yancy's cooperation in the Pierson Hood gang investigation. This is a significant fact that the majority ignores. And it is significant precisely because the majority holds the prosecutor responsible for failing to "correct" evidence that was not patently false and that the defense introduced for its own purpose.

13

Yancy. Defense counsel had ample opportunity for a vigorous cross-examination with full knowledge that Yancy had indeed been paid money by the FBI for information that implicated defendant in the murder of Pass. Given this compelling information, I simply cannot conclude that any infirmity in the testimony elicited from Yancy constituted false or substantially misleading evidence sufficient to warrant the reversal of defendant's convictions. Instead, I would conclude that the testimony under review was at most incomplete and not material to the greater scheme of this criminal trial.

## III. ANY ALLEGED ERROR IS BARRED BY WAIVER

While defense counsel conducted a vigorous cross-examination of Yancy, counsel chose not to clarify Yancy's testimony with regard to compensation from the FBI. I conclude that explicit disclosure of evidence affecting Yancy's credibility, coupled with defense counsel's subsequent failure to raise the specific issue at trial, constituted waiver of the claim at issue in this case.[18] Significantly, when Yancy denied on cross-

---

[18] While the majority does not share the view that a *Napue* error can be waived because counsel could have addressed the issue on cross-examination, I note that the majority of the federal courts of appeals have expressed views consistent with this approach: *United States v Iverson*, 208 US App DC 364, 366; 648 F2d 737 (1981) ("[W]e hold that, absent unusual circumstances, the right of the defendant to disclosure by the prosecutor is deemed waived if defense counsel with actual knowledge of the plea agreement or sentencing status information chooses not to present such information to the jury."); *Green v United States*, 256 F2d 483, 484 (CA 1, 1958) ("But [the defendant] cannot have it both ways. He cannot withhold the evidence [that an assistant United States attorney persuaded a witness to commit perjury against the defendant by promising the witness a light sentence and that he would be spared deportation], gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding . . . ."); *United States v Branch*, 261 F2d 530, 533 (CA 2, 1958) (concluding that when a defendant makes a deliberate choice not to call a witness to testify who claimed to have proof of alleged perjury by a key prosecution witness, "he cannot now by way of motion under [28 USC] 2255 assert a defense . . . which was available but not

14

examination that he was compensated "with regards to this case," defense counsel did not

object, ask for a mistrial, seek a conference outside the presence of the jury, or otherwise

presented at the trial"); *United States ex rel Regina v LaVallee*, 504 F2d 580, 583 (CA 2, 1974) (concluding that when the defense is aware that the prosecution might have offered a promise of leniency in exchange for a witness's testimony but the witness denies it, the defense has an obligation to call available witnesses to prove the existence of the promise because "[a] defendant may not obtain a new trial on the basis of evidence which he could have discovered by reasonable diligence"); *Harris*, 498 F2d at 1169-1170 ("[I]f appellant's counsel was of the opinion that the errors were prejudicial it was his obligation to interpose a timely objection and seek corrective action by the Court. . . . He should have taken this course when he learned of the errors, but failed to do so. A defendant may not sit idly by in the face of obvious error and later take advantage of a situation which by his inaction he has helped to create.") (emphasis omitted) (quotation marks and citations omitted) (alteration in original); *United States v Meinster*, 619 F2d 1041, 1045 (CA 4, 1980) (concluding that because the defendants had knowledge of a "deal" between a witness and the prosecution but took no action on the matter during trial apart from asking the prosecutor if the deal existed, the defendants waived their objection to the witness's testimony that he had received no offer of leniency in exchange for his cooperation); *Beltran*, 294 F3d at 736 (concluding that the defendant waived his right to object to false testimony because "[d]efense counsel was aware that the testimony was misleading but consciously decided not to clarify for the jury" as "part of a deliberate defense strategy"); *Decker*, 543 F2d at 1105 ("[W]e hold that the Government fulfilled its duty of disclosure by supplying appellants with its recollection of the true circumstances of the negotiations with the witnesses at a time when recall and further exploration of these matters was still possible."); *Decker v United States*, 378 F2d 245, 251 (CA 6, 1967) ("We find no decision which fits the case at bar, but it has been held that deliberate toleration of the commission of perjury cannot be later employed to gain judicial relief for one who connived in the use of the perjury."); *Evans v United States*, 408 F2d 369, 370 (CA 7, 1969) ("When a criminal defendant, during his trial, has reason to believe that perjured testimony was employed by the prosecution, he must impeach the testimony at the trial, and 'cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding . . . .' ") (citation omitted); *Ross v Heyne*, 638 F2d 979, 986 (CA 7, 1980); *Sanassarian v California*, 439 F2d 703, 703-704 (CA 9, 1971) (citation omitted); *Routly*, 33 F3d at 1286 ("There is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object.").

ask the court to strike the allegedly false testimony.[19] Presumably defense counsel viewed Yancy's testimony as incomplete, vague, and perhaps even evasive, but deemed this testimony best addressed through vigorous cross-examination. And defense counsel in fact conducted a vigorous cross-examination of Yancy, but instead of clarifying Yancy's testimony with regard to compensation from the FBI, he sought to highlight that Yancy was not paid "with regards to this case" and impeached Yancy by suggesting that Yancy had received not only "[r]eal money" for cooperating with the FBI, but some additional tacit benefit from the prosecution for his testimony and cooperation. An issue is waived if the defendant intentionally abandons a known right.[20] "[W]aiver may be effected by action of counsel."[21] Because defense counsel had full knowledge of

[19] As mentioned, the trial court also presided over and actively participated in the October 6, 2010 hearing in which Yancy's agreement with the FBI was disclosed. Like defense counsel, the court was not surprised by and did not in any way express concern about or take exception to the testimony from Yancy that the majority today declares to be "substantially misleading, if not false." That neither defense counsel nor the experienced and knowledgeable trial judge (both officers of the court under an ethical obligation to correct false testimony) took exception to this testimony weighs strongly in support of my conclusion that the testimony and evidence in question are not material in the greater scheme of this criminal trial.

[20] *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

[21] *Id.* at 218, citing *New York v Hill*, 528 US 110, 114; 120 S Ct 659; 145 L Ed 2d 560 (2000). *Hill* further explained that

> [a]s to many decisions pertaining to the conduct of the trial, the defendant is "deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' " Thus, decisions by counsel are generally given effect as to what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. Absent a demonstration of ineffectiveness, counsel's word on such mtters is the last. [*Hill*, 528 US at 115 (citations omitted).]

16

Yancy's cooperation and compensation and nonetheless chose to impeach Yancy at trial without mentioning the extent of Yancy's cooperation with the FBI, defendant has waived this issue on appeal.[22]

## IV. THE UNPRESERVED ALLEGED ERROR IS FORFEITED

As discussed, defense counsel and the trial court were fully aware that the FBI had compensated Yancy for his cooperation and information implicating defendant in the murder of Pass. Because there was no objection when Yancy denied being compensated "with regards to this case,"[23] defendant's constitutional claim is unpreserved and subject

---

[22] See *Harris*, 498 F2d at 1169-1170. *Harris* involved a claim of false testimony arising from the failure to disclose a witness's deal with the prosecution. After the witness was excused but before the trial concluded, the prosecutor informed the defendant and the court of the witness's remuneration from the prosecution. Accordingly, it was evident that the witness presented false testimony. The defendant did nothing with this information and on appeal claimed that the prosecution had breached the duty to correct false testimony. The United States Court of Appeals for the Third Circuit concluded that the defendant had waived the issue by failing to take any action after being informed of the evidence affecting the witness's credibility. *Id.* at 1170. The majority here asserts that because the prosecutor in *Harris* disclosed to the defendant the full extent and nature of its remuneration with the witness, the prosecution ultimately complied with its *Napue* obligation. The *Harris* disclosure came in the midst of the trial and after the critical witness was excused. I respectfully submit that if disclosure of evidence affecting a witness's credibility is timely when provided in the midst of trial yet after the critical witness has been excused, there should be no question but that the prosecution satisfied its *Napue* obligation here when it disclosed to defense counsel and the trial court the full and complete extent of Yancy's compensation from the FBI at the 2010 hearing during which Special Agent Harris testified.

[23] Again, in each United States Supreme Court case the majority relies on, defense counsel and the trial court were entirely unaware of any of the details relating to the state's agreements to compensate witnesses for their testimony. Thus, defense counsel in those cases obviously could not have objected. In this case, however, defense counsel was aware and readily could have objected to Yancy's testimony. Defense counsel's knowledge invokes an important principle of appellate review. That is, "[t]his Court disfavors consideration of unpreserved claims of error." *People v Carines*, 460 Mich

17

to forfeiture.[24]  "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights."[25]  "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings."[26]  The defendant has the burden of establishing each of these three elements.[27]  In this case, defendant has failed to show that any perceived error affected

---

750, 761; 597 NW2d 130 (1999).  "Michigan has long recognized the importance of preserving issues for appellate review."  *Id*. at 762.  Moreover, we recognize that "[t]rial is 'by far the best time to address a defendant's constitutional and nonconstitutional rights.' "  *Id*., quoting *People v Grant*, 445 Mich 535, 551; 520 NW2d 123 (1994) (emphasis omitted).  For these reasons I seriously question the propriety of the majority's chosen standard of review, which only requires a defendant to establish a " 'reasonable likelihood' that the [allegedly false or substantially misleading testimony] affected the judgment of the jury," quoting *Napue*, 360 US at 271.  In my view, this standard only applies when the issue could not have been preserved at trial.  See, e.g., *Robinson v Arvonio*, 27 F3d 877, 886 (CA 3, 1994) ("[W]hen it became clear that the prosecutor had not corrected the perjured testimony, the defense attorney could have alerted the judge and sought a remedy that would have eliminated any possibility of prejudice to his client . . . .  Instead, the defense attorney sought to counter the misleading impression through cross-examination and closing argument.  Although we agree with [the defendant] that his attorney did not waive the error by failing to call it to the attention of the court, *an error which the defense attorney could have corrected at trial is not likely 'to infect the integrity of the proceeding . . . .'* "), vacated 513 US 1186 (1995) (citation omitted) (emphasis added).

[24] *Carines*, 460 Mich at 763; see also *People v Vaughn*, 491 Mich 642, 663-664; 821 NW2d 288 (2012).

[25] *Carines*, 460 Mich at 763, citing *United States v Olano*, 507 US 725, 731-734; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

[26] *Carines*, 460 Mich at 763, citing *Olano*, 507 US at 734.

[27] *Carines*, 460 Mich at 763.  Further, "[t]he reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings."  *Id*. at 774.  The majority claims that when

18

the outcome of the lower-court proceedings. In affirming defendant's convictions, the Court of Appeals relied heavily on the "fairly dreadful state of Yancy's credibility"[28] to conclude that any error was harmless. The majority believes that the panel's reliance on Yancy's dreadful credibility was misplaced because "the *impossibility* of raising Yancy's credibility from an already 'dreadful state'" was not the critical issue. Rather, the majority frames the issue as "what effect would likely have resulted if the jury had understood that Yancy was compensated for his information against the defendant." In this regard, the majority concludes that reversal is required because "the 'dreadful state' of Yancy's credibility would have been even more dreadful had the jury learned that he was paid for his information against the defendant."

Of course the jury was certainly entitled to question Yancy's credibility. He admitted that he was a regular drug user, was in a dispute with defendant over money, took Pass's drugs (though he gave them to Lard), and left the victim "gurgling off his blood" on the floor (though he testified, "What could I do?" and "I thought I was next"), and left town for a year. Even the prosecutor wryly admitted, "[O]ur witnesses aren't

"the prosecutor deliberately exploit[s] misleading evidence before the jury, [it] clearly affects 'the fairness, integrity or public reputation of judicial proceedings.'" While I take issue with the majority's characterization of the prosecutor's conduct, I also note that the rule of law sanctioned by the majority in this case will give similarly situated defendants a free bite at the apple in future cases. Specifically, defense counsel aware of false testimony can ignore that testimony and roll the dice with a jury, knowing full well that if an acquittal is not obtained, the testimony will afford defendant a reversal on appeal. This rule of law seriously affects "the fairness, integrity, or public reputation of judicial proceedings."

[28] *People v Smith*, unpublished opinion per curiam opinion of the Court of Appeals, issued October 29, 2013 (Docket No. 304935), p 5.

from the Mormon Tabernacle choir . . . ." With that said, " '[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.' "[29] But here, defendant here has only shown a *possibility* that Yancy's credibility could be further diminished. In other words, it is entirely speculative that this possibility would have affected the outcome in this case. It is just as possible that the jury would have ignored additional impeachment given the then-existing "dreadful state of Yancy's credibility." Simply put, the burden is on defendant, and defendant failed to show that any perceived error actually, instead of possibly, affected the outcome of the lower-court proceedings. Accordingly, defendant has not satisfied his burden of establishing plain error that affected his substantial rights and therefore has forfeited this issue on appeal.

## V. THE ALLEGED ERROR WAS HARMLESS

MCL 769.26 provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

This statute essentially embodies Michigan's harmless-error rule.[30] " 'Simply stated, . . . reversal is only required if the error was prejudicial. That inquiry focuses on the nature

---

[29] *Carines*, 460 Mich at 763, quoting *Olano*, 507 US at 734.

[30] *People v Lukity*, 460 Mich 484, 491; 596 NW2d 607 (1999).

of the error and assesses its effect in light of the weight and strength of the untainted evidence.' "[31]

According to the majority, the alleged error prejudiced defendant because the prosecutor bolstered Yancy's credibility by arguing that he had only been paid for his cooperation in other cases:

> Mark Yancy was here, ladies and gentlemen, and he talked to you about [sic] he wasn't charged in this homicide, and that he admitted he was in the house at the time of the homicide, and that he got the cocaine, and gave it to Lard and the defendant. He told you he did not get consideration on this case for testifying, that he got consideration on other cases that the task force was involved with.

No objection was made to the prosecutor's closing argument. Further, this argument is consistent with the record evidence from Flint police officer Shawn Ellis, who testified without objection that Yancy was not paid for his testimony and had "cooperated on other investigations with task force officers." In any event, reviewing courts should not flyspeck trial proceedings with the benefit of 20/20 appellate hindsight. "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."[32] Instead, our law generally demands that trial results not be overturned unless a miscarriage of justice has occurred.[33] This was a 7-day jury trial featuring more than 20 witnesses and numerous exhibits. It is often difficult for seasoned practitioners and judges to keep pace with trial proceedings. It is substantially more difficult for the jury to

---

[31] *Id.* at 492, quoting *People v Mateo*, 453 Mich 203, 215; 551 NW2d 891 (1996).

[32] See *Delaware v Van Arsdall*, 475 US 673, 681; 106 S Ct 1431; 89 L Ed 2d 674 (1986).

[33] See, e.g., MCL 769.26.

21

do so. This one fleeting, arguably inaccurate statement to which no objection was made does not detract from the actual evidence presented at trial and the prosecutor's truthful statement that Yancy "did not get consideration on this case for testifying." Moreover, the prosecutor's statement was responsive to defense counsel's line of questioning that suggested that Yancy had been compensated for his testimony against defendant. And not only did defense counsel suggest that Yancy had been compensated for his testimony against defendant, but he later stated in closing argument, without any factual basis, that Yancy "lied to you about his plea, whether he pled." Notwithstanding this assertion by defense counsel, there is absolutely no evidence that Yancy received any deal from the prosecution in exchange for his testimony in this case.

Further, the majority exaggerates the prejudicial effect of the alleged error. The extent to which Yancy's credibility was bolstered by argument that he had only been paid by the FBI for his cooperation in other cases is, at best, marginal. Additionally, the alleged error was clearly precipitated by the prosecutor's willingness to accommodate defense counsel's trial strategy that avoided "opening the door to Pierson Hood" because, as the trial court noted, doing so would be hazardous.[34] Both the prosecutor and defense counsel fastidiously avoided mention of the Pierson Hood gang during trial. Rather than delve into specific prejudicial information that Yancy had provided to the FBI, defense

---

[34] In 2007, the Flint Safe Streets Task Force, which included members of local and federal law enforcement, arrested more than 30 people related to the Pierson Hood gang, which was a criminal enterprise. Two of the people arrested were defendant and Lard. However, the circuit court quashed the charge against defendant of conducting a criminal enterprise, and eventually the case proceeded to trial only in respect to the murder of Pass.

counsel sought to challenge Yancy on his claim that he was not paid "with regards to this case" and impeached Yancy by suggesting not only that Yancy had received cash from the FBI for cooperation, but that he had also received some tacit benefit from the prosecution for his testimony and cooperation.

Finally, the majority does not address whether even if Yancy's testimony had been struck from the record, the prosecution nonetheless presented sufficient independent evidence at trial to establish beyond a reasonable doubt that defendant murdered Pass. Even if evidence is improperly admitted to bolster a witness's character for truthfulness, reversal is not required under MCL 769.26 if there exists other cumulative and independent evidence to support the conviction.[35] The majority apparently assumes that the jury simply did not believe the other key witness for the prosecution, but "[t]he jury is the sole judge of the facts; its role includes listening to testimony, weighing evidence, and making credibility determinations."[36] Contrary to the assertions of the majority, Lard's testimony was largely consistent with Yancy's testimony with regard to the murder of Pass. It would be very difficult to conclude that the jury convicted defendant on the basis of Yancy's testimony while rejecting Lard's testimony.

Specifically, Yancy and Lard consistently testified that Lard brought defendant to Pass's home, that they used a mutual acquaintance's name to validate their intent to purchase cocaine, and that Pass let them inside. Inside the house, defendant and Pass

---

[35] See *Lukity*, 460 Mich at 488-489, 496-497 (stating that the error was harmless when the prosecutor improperly bolstered the victim's credibility because an untainted witness testified about the defendant's inculpatory apology).

[36] *People v Mardlin*, 487 Mich 609, 626; 790 NW2d 607 (2010).

23

discussed purchasing cocaine in the kitchen, and both Yancy and Lard saw Pass enter the bathroom, presumably to retrieve cocaine. After Pass returned to the kitchen, both Yancy and Lard heard multiple gunshots coming from the kitchen area, where only defendant and Pass were present. Lard testified that neither he nor Yancy shot Pass, but that defendant did so. Lard's testimony alone provided a rational basis to establish that defendant shot and killed Pass. In sum, having examined the entire cause, I cannot conclude that the error alleged by defendant affirmatively appears to have resulted in a miscarriage of justice. I would affirm.

Brian K. Zahra